IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WINFIELD T. WILLIS
 *Plaintiff*,

 v.

BANK OF AMERICA, N.A. *et al.*
 *Defendants*.

Civil Action No. ELH-13-2615

## MEMORANDUM OPINION

In 2013, plaintiff Winfield T. Willis, who is self-represented, filed suit against Bank of America Corporation, N.A. ("BANA"),[1] among other defendants. *See* ECF 2 ("Complaint").[2] The source of the dispute stems from a mortgage loan in the sum of $350,000, obtained by Willis and Patricia Lewis[3] in connection with certain real property located on Hillsdale[4] Road in Baltimore, Maryland (the "Property").

In his "Supplemental Amended Complaint" (ECF 30, "Supplemental Amended Complaint" or "SAC"), plaintiff lodges claims against BANA for breach of contract; violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*; violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*; violations of the Real Estate

---

[1] BANA "is the successor by merger to BAC Home Loans Servicing, which was known formerly as Countrywide Home Loans Servicing LP." *Deutsche Bank Nat'l Trust Co. v. Brock*, 430 Md. 714, 720 n.6, 63 A.3d 40, 43 n.6 (2013).

[2] Suit was initially filed in the Circuit Court for Baltimore City. ECF 2, Complaint. BAC and BANA removed the case to federal court on September 9, 2013, invoking federal question jurisdiction pursuant to 28 U.S.C. § 1331, and diversity jurisdiction pursuant 28 U.S.C. § 1332. *See* ECF 1 ("Notice of Removal"). In the Notice of Removal, BANA asserts that the suit was filed on or about April 18, 2013. ECF 1 ¶ 1. However, elsewhere defendant alleges that suit was filed on August 1, 2013. *See* n.19, *infra*. Given that the removal occurred in September 2013, it seems likely that suit was filed in August 2013.

[3] Patricia Lewis is not a party to this action.

[4] In a letter from the original lender, the street is identified as "Hillside," not "Hillsdale." *See* ECF 2-1.

Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*; and claims under the Maryland Consumer Protection Act ("MCPA"), Md. Code (2013 Repl. Vol., 2014 Suppl.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L.").

Pursuant to Fed. R. Civ. P. 12(b)(6), BANA filed a motion to dismiss the Supplemental Amended Complaint (ECF 32), supported by a memorandum of law (ECF 32-1, "BANA Memo.") and one exhibit (ECF 32-2) (collectively, I refer to ECF 32 and ECF 32-1 as "Motion to Dismiss" or "Motion"). BANA filed the Motion on behalf of "itself and as successor by merger to BAC Home Loans Servicing, LP . . . ." ECF 32 at 1, Motion to Dismiss. Plaintiff opposes the Motion ("Opposition," ECF 40), and defendant has replied ("Reply," ECF 41).

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will grant BANA's Motion.

## I.   Procedural Background

Plaintiff initially filed suit against defendants "Bank of America Corporation" ("BAC"); "Bank of America, N.A.," *i.e.*, BANA; "Bank of America Home Loans"; and "BAC Home Loans Servicing, LP (Countrywide Home Loans Servicing, LP)." ECF 2 at 1, Complaint.[5] The Complaint consumed twenty-five single-spaced pages, contained twenty-two counts, and included twenty-one exhibits.[6] *See* ECF 2; ECF 2-1 through ECF 2-21. BAC and BANA moved

---

[5] Other defendants named in the original Complaint have since been dismissed or, according to BANA, are not the proper party in interest in this case.

[6] The Complaint's twenty counts were as follows: Count I: "(Deceptive Trade Practices) Kick Backs & Yield Spread Premium"; Count II: "(Breach of Fiduciary Duty) Kick Backs & Yield Spread Premium"; Count III: "(Unjust Enrichment) Kick Backs & Yield Spread Premium"; Count IV: "(Violation of Section 6 of RESPA – 12 U.S.C. 2605)"; Count V: "(Violation of the Fair Debt Collection Practices Act) Robo-Signing"; Count VI: "(Wrongful Foreclosure Filing) Robo-Signing"; Count VII: "(Violation of the Maryland Consumer Protection Act) Robo-Signing"; Count VIII: "(Breach of Contract) (Implied Covenant of Good Faith and Fair Dealing) Robo-Signing"; Count IX: "(Unjust Enrichment) Robo-Signing"; Count X: "(Injunctive/Declaratory Relief) Robo-Signing"; Count XI: "(Common Law Fraud) Robo -

to dismiss the Complaint.   *See* ECF 10 ("First Motion to Dismiss").[7]   The Motion culminated in

a 75-page Memorandum Opinion (ECF 23) and Order dated August 1, 2014 (ECF 24), in which I

granted the First Motion to Dismiss (ECF 10), dismissing eighteen of the original twenty-two

counts, with prejudice.   Four of the original twenty-two counts were dismissed, without

prejudice.   These were the claims for "(Deceptive Trade Practices) Kick Backs & Yield Spread

Premium" (Count I); "(Breach of Contract) (Implied Covenant of Good Faith and Fair Dealing)

Robo–Signing" (Count VIII); "(Breach of Contract) Constructive Fraud – Forged Loan

Documents" (Count XVII); and "(Deceptive Trade Practices) Predatory Servicing" (Count XX).

In my Order (ECF 24), I granted plaintiff leave to amend as to BANA with respect to Count 1

(RESPA, TILA, and MCPA); Counts VIII and XVII (breach of contract), and Count XX

(MCPA).[8]   In addition, BAC was dismissed from the suit.   ECF 24.

Thereafter, plaintiff filed an amended complaint (ECF 28, "Amended Complaint").   By

Order dated September 17, 2014 (ECF 29), I said, *id.* at 1:

---

 Signing"; Count XII: "(Deceptive Trade Practice) Standing"; Count XIII: "(Common Law
Fraud) Forged Loan Documents"; Count XIV: "(Violation of the Fair Debt Collection Practices
Act) Forged Loan Documents"; Count XV "(Wrongful Foreclosure Filing) Forged Loan
Documents"; Count XVI: "(Violation of the Maryland Consumer Protection Act) Forged Loan
Documents"; Count XVII: "(Breach of Contract) (Implied Covenant of Good Faith and Fair
Dealing) Forged Loan Documents"; Count XVIII: "(Unjust Enrichment) Forged Loan
Documents"; Count XIX: "(Injunctive/Declaratory Relief) Forged Loan Documents"; Count XX:
"(Deceptive Trade Practices) Predatory Servicing"; Count XXI: "(Breach of Fiduciary Duty)
Predatory Servicing"; and Count XXII: "(Unjust Enrichment) Predatory Servicing."   ECF 2,
Complaint.

[7] In the First Motion to Dismiss, BANA and BAC explained: "There is no legal entity
named Bank of America Home Loans." ECF 10-1 at 1 n.2. Defendants also alleged that
"Countrywide Home Loans Servicing, L.P. changed its name to BAC Home Loans Servicing,
L.P. effective April 27, 2009, and BAC Home Loans Servicing, L.P. merged with and into
BANA on July 1, 2011." *Id.* Plaintiff did not challenge this assertion. BANA and BAC also
indicated that BAC was improperly named as a party to the lawsuit because BAC is a holding
company and does not originate or service loans. *Id.* at 1 n.1.

[8] To the extent pertinent, I incorporate here the factual background and legal analysis set
forth in ECF 23.

I ask plaintiff to file a revised Amended Complaint, to be titled "Supplemental Amended Complaint," which contains all allegations and claims that plaintiff wishes to pursue, and which does not incorporate allegations raised in the original Complaint. In other words, in the Supplemental Amended Complaint, plaintiff should set forth all allegations that he believes are pertinent to the claims he is pursuing at this stage.

Plaintiff timely filed his Supplemental Amended Complaint.  ECF 30, SAC.  BANA, "for itself and as successor by merger to BAC Home Loans Servicing, LP," moved to dismiss the Supplemental Amended Complaint.  ECF 32, Motion to Dismiss.[9]  That Motion is pending.

## II.   Factual Background[10]

### A.  Loan and Loan Documents

As noted, the dispute in this case is rooted in a mortgage loan in the sum of $350,000, obtained by plaintiff and Patricia Lewis to finance the Property.  The subject loan is evidenced by a promissory note ("Note") executed by Willis in favor of Bondcorp Realty Services, Inc. ("Bondcorp").  *See* ECF 2 ¶ 4, Complaint.[11]  The Note is secured by a Deed of Trust

---

[9] By Order of November 10, 2014 (ECF 33), the Court granted defendant's Motion to Dismiss, "provided, however, that by November 24, 2014, plaintiff may file a motion to rescind the Order on the ground that it was improvidently granted."  On November 24, 2014, plaintiff timely filed a Motion to Vacate Order (ECF 34, "Motion to Vacate"), asking the Court to rescind its Order of November 10, 2014.  By Order of November 25, 2014 (ECF 35), I granted plaintiff's Motion to Vacate (ECF 34); the Order dismissing the Supplemental Amended Complaint (ECF 33) was rescinded; and the Supplemental Amended Complaint (ECF 30) and BANA's Motion to Dismiss Supplemental Amended Complaint (ECF 32) were reinstated.

[10] According to defendant, in plaintiff's Supplemental Amended Complaint, plaintiff "omits several of the basic, underlying allegations regarding the Property, the loan, and the foreclosure which were originally found in the Complaint."  ECF 32-1 at 3 n.3, BANA Memo. In addition, the Supplemental Amended Complaint refers to exhibits attached to the original Complaint that were not resubmitted with the Supplemental Amended Complaint.  As a self-represented litigant, plaintiff may not have realized that he should have incorporated by reference the exhibits he previously submitted or, alternatively, refiled them.  Therefore, giving plaintiff the benefit of liberal construction, I refer to the exhibits he attached to the original Complaint, as well as to facts asserted in the Complaint.

[11] Plaintiff describes Bondcorp as the "mortgage broker."  *See* ECF 30 ¶ 8, SAC.  But, the Loan Documents submitted with the Complaint designate Bondcorp as the lender.

(collectively, I refer to the Note and the Deed of Trust as the "Loan Documents"). *Id.*

The date on which the Loan Documents were executed is a subject of dispute. Plaintiff attached two sets of Loan Documents to his Complaint. One set is dated December 16, 2005, and the other set is dated January 2, 2006. *Compare* ECF 2-19, Note dated December 16, 2005 *and* ECF 2-18, Deed of Trust dated December 16, 2005 *with* ECF 2-10, Note dated January 2, 2006 *and* ECF 2-15, Deed of Trust dated January 2, 2006. Apart from the discrepancy as to execution dates, both sets of Loan Documents appear identical. For example, both sets were executed by Willis and reflect the same loan amount of $350,000; each Deed of Trust references the same loan number and designates Bondcorp as the lender and Mortgage Electronic Registration System, Inc. ("MERS") as the nominee for the lender and the lender's successors and assigns; each Note reflects an interest rate of 7.250% and a monthly payment of $2,387.62, commencing on February 1, 2006, with a loan maturity date of January 1, 2036. *Compare* ECF 2-19, Note dated December 16, 2005, *and* ECF 2-18, Deed of Trust dated December 16, 2005, *with* ECF 2-10, Note dated January 2, 2006, and ECF 2-15, Deed of Trust dated January 2, 2006.

The Complaint does not clearly indicate whether the loan was used to finance the acquisition of the Property, or whether the subject loan was a refinancing transaction. ECF 2. BANA claims that the loan in question was used to finance the initial purchase of the Property. ECF 32-1 at 3. Plaintiff suggests it was a refinancing. *See, e.g.*, ECF 30 ¶¶ 10, 12.

Prior to March 1, 2006, Willis received an undated letter from Bondcorp stating that Bondcorp had sold his loan "in the secondary marketplace." ECF 2-1, Letter from Bondcorp. Bondcorp also informed Willis that the servicing rights to the loan had been transferred. *Id.* Plaintiff was instructed that, as of March 1, 2006, all loan payments were to be made to Countrywide Home Loans, Inc. *Id.*

It appears that Willis subsequently defaulted on the Note.  As a result, in February 2010, Bondcorp initiated foreclosure proceedings on the Property.  ECF 30 ¶ 25, SAC.  Plaintiff submitted as an exhibit to the Complaint an undated "Order to Docket Foreclosure of Residential Property," filed in the Circuit Court for Baltimore City against Willis.  ECF 2-5 ("Order to Docket").[12]  The Order to Docket reflects that the matter was an "action in foreclosure" filed by Edward S. Cohn and Cohn, Goldberg & Deutsch, LLC, "Attorneys for the Substitute Trustees," on behalf of the lender, "Bondcorp Realty Services, Inc."  *Id.*  The Substitute Trustees, as plaintiffs in the foreclosure case, were Cohn as well as Stephen N. Goldberg, Richard E. Solomon, and Richard J. Rogers.

According to Willis, loan documents were "forged" and "fabricated."  ECF 30 ¶ 4, SAC. Moreover, he avers that the foreclosure case was dismissed "[s]ometime" in 2011, because of a "robo-signing scandal."  ECF 30 ¶ 26, SAC; *see also* ECF 2 ¶ 14 (stating that the foreclosure action relied on "false, fabricated and counterfeit affidavits [ ] now commonly known as 'robo signing'" and notarized documents that the notaries knew contained false information); *id.* ¶¶ 20-21, 28.   Willis asserts that, "[a]s a result of the disclosure of the robo-signing sandal [sic], Plaintiff conducted an in depth review of the foreclosure loan documents and discovered that the Defendant not only conducted robo-signing for the required foreclosure documents but also conducted robo-signing in regards to the actual Note and Deed of Trust."  ECF 30 ¶ 27, SAC.

On April 18, 2012, the Deed of Trust was assigned to BANA, as successor by merger to BAC Home Loans Servicing LP, f/k/a Countrywide Home Loans Servicing LP. ECF 32-2 at 1.

---

[12] In Maryland, a foreclosure action begins with the filing of an order to docket.  *See* Md. Code (2010 Repl. Vol., 2014 Supp.), Real Property Article ("R.P.") § 7-105.1(d); Md. Rule 14-207(a)(1); *Anderson v. Burson*, 424 Md. 232, 236 n.6; 35 A.3d 452, 455 n.6 (2011)).   Under Maryland law, an order to docket must include certain documentation, such as a copy of the deed of trust.  *See* Md. Rule 14-207(b); R.P. § 7-105.1(d)(1)-(2).

("Assignment"). [13]

The remaining facts are difficult to glean from the Supplemental Amended Complaint. But, it appears that most of plaintiff's allegations pertain to the following: (1) BANA engaged in deceptive and predatory conduct as to the loan and allegedly encouraged Bondcorp to engage in predatory lending practices, resulting in the payment of kickbacks to Bondcorp; (2) BANA allegedly falsified, fabricated, or robo-signed documents related to Willis's mortage loan, *i.e.*, the Note and the Deed of Trust, and forged or "robo-signed" foreclosure documents; and (3) BANA failed to offer plaintiff a loan modification plan pursuant to the Home Affordable Modification Program ("HAMP"), despite plaintiff's qualification for such a modification. [14]

### B.  BANA's Alleged Kickbacks to Bondcorp; Predatory Lending Practices

In his Supplemental Amended Complaint, Willis asserts that "[d]efendant's agent, Bondcorp Realty Services, Inc., contacted Plaintiff to refinance a home loan."  ECF 30 ¶ 10, SAC.  It is not clear, according to the Supplemental Amended Complaint, precisely when this occurred.  In any event, plaintiff complains that during the refinancing process BANA paid the "mortgage broker," Bondcorp, "unreasonable compensation in the form of concealed kickbacks

---

[13] The Assignment, which was recorded in the Baltimore City land records at Liber 14224, Page 484, is attached as an exhibit to defendant's Motion.  *See* 32-2.  It was also attached to the First Motion to Dismiss.  Plaintiff has not objected to the exhibit or disputed its authenticity.  In any event, as discussed, *infra*, because the Assignment is a public record, this Court may consider it without converting the Motion to Dismiss to one for summary judgment. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) ("[A] a court may properly take judicial notice of matters of public record . . . .") (internal quotations omitted).

[14] In *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 773 (4th Cir. 2013), the Fourth Circuit explained: "HAMP was part of Congress's response to the financial and housing crisis that struck the country in the fall of 2008. It provided an incentive for lenders to modify mortgages so that struggling homeowners could stay in their homes. *See* 'Emergency Economic Stabilization Act of 2008,' Pub L. No. 110–343, 122 Stat. 3765 (2008), codified at 12 U.S.C. § 5201 *et seq.*"

and yield spread premiums. . . .," ECF 30 ¶ 3, SAC, and engaged in "deceptive" trade practices. *Id.* ¶ 22.

According to Willis, at the time of the loan transaction, he had a credit score exceeding 700. *Id.* ¶ 10. As explained in the Supplemental Amended Complaint, the purported refinancing scheme began with an initial promise from Bondcorp that it would "obtain the best available rate from the Lender, the Defendant, due to the Plaintiffs [sic] credit score." *Id.* ¶ 11; *see also id.* ¶¶ 17, 21. According to plaintiff, Bondcorp also represented that the "broker's fee" for the refinancing would be limited to 1% of the $350,000 loan principal amount. *Id.* ¶ 11; *see also id.* ¶ 17.

Plaintiff complains that Bondcorp did not secure the "best available rate," as promised. *Id.* ¶ 11. Instead, Bondcorp "increase[d]", *id.* ¶ 13, plaintiff's interest rate on the loan to 7.25%, which was a "two percent . . . higher [ ] interest rate [than] the 'par rate'" at the time, "resulting in damages" of $210,000 "over the life of the 30 year loan . . . ."[15] *Id.* ¶ 15; *see also* ECF 2-19, Note dated December 16, 2005; ECF 2-10, Note dated January 2, 2006. Plaintiff insists that, in light of his excellent "credit history," ECF 30 ¶ 13, SAC, and credit score of "over a 700," *id.* ¶ 10, the increase in the interest rate was "unreasonable and not warranted . . . ." *Id.* ¶ 13.

Plaintiff alleges that BANA and defendant's agent, Bondcorp, both "profited" from the increased interest rate. *Id.* ¶ 14. He posits that BANA benefited from the rate hike because a

---

[15] Plaintiff characterizes the modification of his interest rate to 7.25% as an "increase" in the rate. ECF 30 ¶ 13, SAC; *see also id.* ¶ 15. But, plaintiff never specifies his prior interest rate. And, the versions of the Note attached to the Complaint indicate a loan interest rate of 7.25%. ECF 2-19, Note dated December 16, 2005; ECF 2-10, Note dated January 2, 2006. If the versions of the Note attached to the Complaint relate to a loan used to purchase the Property, it appears that there was no increase in the interest rate from an initial rate of 7.25%. But, it is not clear from the Complaint or Supplemental Amended Complaint if the loan that is the subject of plaintiff's allegations is in regard to the initial purchase of the Property or, instead, in connection with a refinancing transaction. BANA claims that the loan in question pertained to the initial purchase of the Property. ECF 32-1 at 3, BANA Memo.

higher interest made it "easier" for BANA to "resell the loan to investors" in the "securities marketplace" at "a higher price . . . ." *Id.* Plaintiff further alleges that BANA paid Bondcorp a "[k]ickback in the form of a Yield Spread Premium," *id.* ¶ 16, in two payments of $2,857.99, totaling $5,715.98. *Id.* ¶ 20.

Yield spread premium is an "industry term" describing "all expenses that a lender pays to a broker in order to lower the borrower's up-front closing costs and facilitate loan creation. The borrower then repays the lender through a higher interest rate over the life of the loan." *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 445 (6th Cir. 2012) (citing *Glover v. Standard Fed. Bank*, 283 F.3d 953, 957-58 (8th Cir. 2002)). The Sixth Circuit explained in *Lee*, 692 F.3d at 445:

> The amount of the Yield Spread Premium in each case is determined by looking at the difference between the preset "par rate" and the interest rate on the eventual loan. The par rate represents the interest rate at which the lender would fund 100% of the loan with no premiums. Lenders calculate and communicate the par rate daily to brokers. For a broker to earn any Yield Spread Premium, the borrower's eventual loan must be "above par." The higher the interest rate on the eventual loan, the higher the premium the broker earns, and the easier it will be for the lender to resell the mortgage to investors in the securities marketplace.

Plaintiff insists the yield spread premium was unreasonable because Willis "was refinancing a home which did not require . . . Bondcorp, to lower the Plaintiff's up-front cost[s] . . . ." ECF 30 ¶ 12, SAC. According to plaintiff, Bondcorp "was only acting as a loan broker for a 1% agreed upon origination fee due to Plaintiff's credit history." *Id.* ¶ 21. He insists that the higher interest rate and the resulting yield spread premium were the product of the "greed" of BANA and its agent, Bondcorp. *Id.* ¶ 13.

To establish that these yield spread premium payments were made to Bondcorp, plaintiff refers to ECF 2-1, which includes, at the bottom of the document, two "Temporary Payment Coupon[s]." ECF 30 ¶ 20, SAC; *see also* ECF 2-1. One coupon is for a payment of $2,857.99

due to Countrywide on March 1, 2006.  ECF 2-1 at 1.  The other coupon is for a payment of $2,857.99 due to Bondcorp by February 1, 2006.  *Id.*   ECF 2-1 also includes a letter from Bondcorp to plaintiff and Lewis stating, in pertinent part: "Your monthly payment amount has not changed . . ."  ECF 2-1.  The letter itemized the calculations, consisting of a "principal and interest" payment of $2,387.62; a "reserve for property taxes" of $377.95; and a "hazard insurance reserve" of $92.42.  This amounts to a "total monthly payment[ ]" of $2,857.99.  *Id.*

According to plaintiff, BANA "caused" the damages by its conduct.  ECF 30 ¶ 15, SAC.  As explained by plaintiff, when taking into account the "kickback" or "yield spread premium" amount, the total fees paid to Bondcorp amounted to $5,715.98.  That is, according to plaintiff's calculations, 1.545% of the $350,000 loan principal amount, as opposed to the 1% "agreed upon" fee for the broker.  ECF 30 ¶ 21, SAC; *see also id.* 11, 19.   Plaintiff alleges that BANA and Bondcorp "deceiv[ed]" Willis into paying these fees to Bondcorp and that the true nature of the fees was "conceal[ed]" from him.  *Id.* ¶ 22.

### C.  BANA's Forged or Fabricated Documents

Plaintiff also complains of certain documents purportedly forged or fabricated by BANA.  As explained by plaintiff, after the dismissal of the foreclosure proceeding against him in 2011, plaintiff "conducted an in depth review of the foreclosure loan documents . . . ."  ECF 30 ¶ 27, SAC.  Plaintiff contends that the review revealed that defendant "robo-sign[ed]" the "required foreclosure documents" in addition to the actual Note and Deed of Trust.  *Id.* ¶ 27.

With respect to the "fabricated" Note and Deed of Trust, ECF 30 ¶ 4, plaintiff alleges that defendant "changed the date [of execution from December 16, 2005, to January 2, 2006] and applied the signature of the Plaintiff to the Note" and "notarized some of the signatures."  *Id.* ¶ 28.   Plaintiff insists that he "never signed the Note or Deed of Trust on January 2, 2006,

therefore, the Defendant's robo-signing of these documents were fraudulent and/or intentional misrepresentation." *Id.* ¶ 29.   Willis highlights certain language on the Note, which states: "'Witness the Hands and Seal(s) of the Undersigned.'" *Id.* ¶ 30 (quoting the Note).   Plaintiff maintains that "because the Plaintiff did not sign the Note on January 2, 2006 as cited in the Note which was recorded by the Defendant, the Note is invalid and unenforceable." *Id.* ¶ 30.

Plaintiff also points to similar language in the Deed of Trust, which states: "'In Signing Below, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.'" ECF 30 ¶ 31, SAC (quoting the Deed of Trust).   He asserts that "because the Plaintiff did not sign the Deed of Trust on January 2, 2006 as cited in the Deed of Trust which was recorded by the Defendant, the Deed of Trust is invalid and unenforceable." *Id.* ¶ 31. Plaintiff adds: "Defendant breached their contractual obligations for the Note and Deed of Trust by not disclosing to the Plaintiff that the Defendant fraudulently and/or intentionally misrepresented the fact that the Defendant's [sic] illegally affixed the Plaintiff's signature to the Note and Deed of Trust dated January 2, 2006." *Id.* ¶ 32.

### D.  BANA's Failure to Offer a HAMP Loan Modification

Willis complains about BANA's purported failure to offer him a particular type of loan modification.   He characterizes this failure as "predatory servicing."   ECF 30 ¶ 49, SAC.   In particular, in December 2012 and March 2013, plaintiff requested "loan retention information" from BANA. ECF 2-20, Letter from Willis to BANA dated March 30, 2013 (stating, "I spoke with a home retention counselor on 12/28/2012 and provided requested loan retention information to another counselor over the telephone on 3/26/2013").   In response, BANA "counselors" offered plaintiff "only one modification program . . . which [provided for] back

payments and the principal to be rolled into one loan regardless [of whether] the value of the home [was] significantly lower." *Id.* Plaintiff insists this decision to offer only one type of loan modification was "driven [ ] by greed," *id.* ¶ 49, and that BANA was obligated to offer plaintiff a HAMP loan modification.

As noted, HAMP "provide[s] an incentive for lenders to modify mortgages so that struggling homeowners could stay in their homes." *Spaulding v. Wells Fargo Bank, N.A.,* 714 F.3d 769, 773 (4th Cir. 2013). According to plaintiff, BANA "voluntarily accepted funds from the Economic Stabilization Act, 12 U.S.C. § 5201 which provided a $700 billion bailout to the banks." ECF 30 ¶ 42, SAC. Plaintiff avers that "in return" for these funds, defendant was mandated to participate in certain programs "designed to assist struggling homeowners . . . ." *Id.* ¶ 43. As explained by plaintiff, "[o]ne such program was the Home Affordable Modification Program (HAMP) 12 U.S.C. 5219, 5219a, 1715z-23, which actually requires a loan modification under certain conditions, leaving no discretion to the bank." *Id.* ¶ 44. Thus, plaintiff claims that, by accepting bailout funds, BANA was "bound by the HAMP requirements." *Id.* ¶ 45.

Further, plaintiff contends that he was qualified for a HAMP modification, and thus BANA was required to offer plaintiff a "Trial Period Plan . . . as a first step to HAMP modification." *Id.* ¶ 47. As explained by plaintiff, defendant "never offered" the Trial Period Plan and "never mentioned the HAMP program to Plaintiff . . . ." *Id.* ¶ 48. Therefore, plaintiff accuses defendant of "concealing" that a HAMP modification was a viable option, and offered plaintiff only one modification option. *Id.* ¶ 49; *see also* ECF 2-20, Letter dated March 30, 2013, from Willis to BANA (complaining that BANA "counselors" offered "only one modification program . . . which only allowed all back payments and the principal to be rolled into one loan regardless if the value of the home is significantly lower").

According to plaintiff, "by concealing facts of the availability of the HAMP modification to the Plaintiff and by deceiving and misleading the Plaintiff by offering [an alternative modification] plan," BANA "conducted predatory servicing against the Plaintiff. . . ."  ECF 30 ¶ 49, SAC.  Plaintiff posits that the decision [to offer a plan other than HAMP] "was driven solely by greed instead of abiding by the mandatory requirements the Defendant pledged to follow in exchange for receiving the funds from the Economic Stabilization Act bailout."  *Id.*

Additional facts are included in the Discussion.

### IV. Standard of Review

#### A.  Fed. R. Civ. P. 12(b)(6)

Defendant's Motion is predicated on Fed. R. Civ. P. 12(b)(6).  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 555 n.3 (2007).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.* ____ U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).  But, the rule

demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see City of Shelby, Miss.*, 135 S. Ct. at 347; *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009); *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ____ U.S. ____, 132 S. Ct. 1960 (2012).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 402 (2011). A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Moreover, the court is not required to accept legal conclusions drawn

14

from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville,* 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards*, 178 F.3d at 243 (quotation marks omitted); *see Houck*, *supra*, 791 F.3d at 484; *Tobey v. James*, 706 F.3d 379, 387 (4th Cir. 2013).  But, "if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint,'" or in other material that is the proper subject of consideration under Rule 12(b)(6), such a defense can be resolved on the basis of the facts alleged in the complaint.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc)  (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*); *see Houck*, 791 F.3d at 484.

Plaintiff attached numerous exhibits to the original Complaint.  ECF 2-1 through ECF 2-19.  Several of these exhibits are also referenced in the Supplemental Amended Complaint.  Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings . . . ."  *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013).  But, a court "may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'"  *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014).  A document is "integral" if it is one "that by its 'very existence, *and not* the mere *information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation

omitted) (emphasis in original).  Because Willis has relied on these exhibits in bringing suit, and defendant does not object to the exhibits, I will consider them in ruling on the Motion.

When a court considers materials beyond those incorporated into the pleadings, ordinarily "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Under certain limited exceptions, however, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). For instance, without converting a motion under Rule 12(d), "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"[16] *Id.*; *see* Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 115 (2011). However, "these facts [must be] construed in the light most favorable" to the non-movant. *Clatterbuck*, 708 F.3d at 557.

I am also mindful that plaintiff is a self-represented litigant.  Thus, his pleadings are "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citation omitted). "However, liberal construction does not absolve Plaintiff from pleading a plausible claim." *Bey v. Shapiro Brown*

---

[16] "Adjudicative facts are simply the facts of the particular case."  Fed. R. Evid. 201 advisory comm. nn.

16

*& Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md.), *aff'd*, 584 F. App'x 135 (4th Cir. 2014); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.,* No. DKC 10–3517, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011) ("[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim."), *aff'd,* 526 F. App'x 255 (4th Cir. 2013).

Moreover, "[a] district court is not required to act as an advocate for a pro se litigant." *Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir.1978), *cert. denied,* 439 U.S. 970 (1978). Nor is it obligated to "anticipate all arguments" or "conjure up questions never squarely presented," or to fashion claims for a pro se plaintiff. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986); *see also M.D. v. Sch. Bd. of City of Richmond*, 560 F. App'x 199, 203 n.4 (4th Cir. 2014) (rejecting self-represented plaintiff's argument that district court erred in failing to consider an Equal Protection claim, because plaintiff failed to allege it in the complaint); *Williams v. Ozmint,* 716 F.3d 801, 810-11 (4th Cir. 2013) (stating that a self-represented plaintiff's "'catch-all'" request for "'any other relief that seems just and proper'" was insufficient to preserve a claim for declaratory relief) (citation omitted), *cert. denied*, ____ U.S. ____, 134 S. Ct. 1294 (2014); *Telford v. Vandusen*, 972 F.2d 342, *1 (4th Cir. 1992) (unpublished) (district court did not err in ignoring self-represented plaintiff's "property damage" claim, because plaintiff made only an "oblique reference to the property damage in the body of the complaint, [and] it [was] nowhere mentioned in the demand for judgment.").

As the Fourth Circuit has said, district courts cannot "anticipate all arguments" that may be raised on appeal, and to require this "would not only strain judicial resources by requiring those courts to explore exhaustively all potential claims of a *pro se* plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett*, 775

F.2d at 1278 (citing *Leeke*, 574 F.2d at 1151). What the Fourth Circuit stated in *Harris v.*

*Angliker*, 955 F.2d 41, 1992 WL 21375, at *1 (4th Cir. 1992) (per curiam), is also apt:

> It is neither unfair nor unreasonable to require a pleader to put his complaint in an
> intelligible, coherent, and manageable form, and his failure to do so may warrant
> dismissal. *Corcoran v. Yorty,* 347 F.2d 222, 223 (9th Cir.), *cert. denied,* 382 U.S.
> 966, 86 S.Ct. 458, 15 L.Ed.2d 370 (1965); *Holsey v. Collins,* 90 F.R.D. 122, 128
> (D.Md. 1981). District courts are not required to be mind readers . . . .

### B.  Fed. R. Civ. P. 9

To the extent the Supplemental Amended Complaint lodges claims of fraud, Fed. R. Civ.

P. 9(b) is pertinent.[17] Such allegations implicate the heightened pleading standard under Fed. R.

Civ. P. 9(b).  It states: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally." *See, e.g.*, *Spaulding*, *supra*, 714 F.3d at 781 (stating

that a Maryland Consumer Protection Act claim that "sounds in fraud, is subject to the

heightened pleading standards of Federal Rule of Civil Procedure 9(b)"); *E–Shops Corp. v. US*

*Bank N.A.,* 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also

applies to statutory fraud claims.").

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "'must, at a minimum,

describe the time, place, and contents of the false representations, as well as the identity of the

person making the misrepresentation and what he obtained thereby.'" *United States ex rel.*

*Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)

(citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when,

where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe,*

660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

---

[17] In the Supplemental Amended Complaint, plaintiff does not lodge a common law fraud
claim.  However, as discussed, *infra*, defendant posits that Count XX is tantamount to a fraud
claim and, according to defendant, this count is therefore subject to Rule 9(b).

Rule 9(b) serves several salutary purposes.  In *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999), the Fourth Circuit said (quoting *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)):

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

However, the plain text of Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 786. Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, No. HAR–92–3421, 1993 WL 454355, at *9 (D. Md. Sept.14, 1993)); *accord Piotrowski v. Wells Fargo Bank, N.A.,* No. DKC 11–3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013).

### III.    Discussion

As indicated, the Supplemental Amended Complaint contains four counts against defendant: Count I, titled "(Deceptive Trade Practices) Kick Backs & Yield Spread Premium"; Count VIII, titled "(Breach of Contract) Robo Signing"; Count XVII titled "(Breach of

Contract") Constructive Fraud – Forged Loan Documents"; Count XX titled "(Deceptive Trade Practices) Predatory Servicing."   I will address each count in turn.

## A.  Count I, titled "(Deceptive Trade Practices) Kick Backs & Yield Spread Premium"

In Count I, plaintiff posits that defendant "deceiv[ed]" plaintiff into paying a total of $5,715.98 (ECF 30 ¶ 22, SAC) in "kickbacks" to Bondcorp.  *Id.* ¶ 3; *see* ¶ 20.  The payments occurred in February and March of 2006.  *Id.* ¶ 2 (referring to the Temporary Payment Coupons, ECF 2-1, as evidence of payments to Bondcorp).  According to plaintiff, the deceptive practices that resulted in the kickback payments to Bondcorp contravened TILA, RESPA, and MCPA.[18] He seeks compensatory damages of $215,716.  ECF 30 ¶ 22.

In seeking dismissal of Count I, defendant lodges several arguments.

Defendant argues that Count I relates to the "origination of the loan."  ECF 32-1 at 7. Therefore, BANA contends that it "cannot be liable for any claims premised upon the origination of the loan" because it was not "involved" with the loan at that time.  *Id.*

A "Settlement Statement" executed on December 16, 2005, and attached to the Complaint (ECF 2-17 at 1), identified Bondcorp, not BANA, as the lender.   Similarly, the Deed of Trust that Willis claims is legitimate, dated December 16, 2005 (ECF 2-18), and the Note of the same date (ECF 2-19), both identify Bondcorp, not BANA, as the lender.  Moreover, the Assignment of the loan to BANA on April 18, 2012 (ECF 32-2) also identified Bondcorp as the original lender.

Plaintiff acknowledges that Bondcorp was the original lender.   *See* ECF 40 ¶ 3,

---

[18] As noted, TILA is the acronym for the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*; FDCPA is the abbreviation for the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*; RESPA is the acronym for the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601; and MCPA is the abbreviation for the Maryland Consumer Protection Act, C.L. §§ 13-101 *et seq.*

Opposition.   Nonetheless, in plaintiff's view, BANA remains liable for Bondcorp's conduct at the time of origination based on "assignee liability . . . ."   *Id.* ¶ 2.   Plaintiff explains, *id.* ¶ 3, Opposition:

> [I]f Bondcorp was listed as the Lender in the table funded loan with the loan assigned to Countrywide at closing, and the Defendant purchased Countywide and assigned the Plaintiff's loan to the Defendant; then the Defendant assumed all the liabilities of the original lender in accordance with assignee liability under Maryland Commercial Law Article 3-306.

Plaintiff's argument is unpersuasive.   In this context, C.L. § 3-306 is not relevant.   The provision states, in part:  "A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds . . . ."   C.L. § 3-306.   As such, under C.L. § 3-306, once BANA obtained ownership of the note, it remained subject to other "property or possessory right[s]" in the subject debt instrument.

To be sure, plaintiff does not assert that he has a competing property or possessory right in the loan.   And, many of plaintiff's accusations in Count I relate to Bondcorp's conduct and its use of purportedly "deceptive trade practices."   But, there are no allegations that suggest that Bondcorp is an affiliate of BANA.   Therefore, the accusations against BANA pertaining to the loan's origination appear unfounded, as BANA was not a party to the initial loan transaction. Moreover, it is plain that C.L. § 3-306 does not create a basis to hold BANA liable for the conduct of Bondcorp prior to BANA's involvement in the loan.

In addition, defendant contends that the claims in Count I are time-barred.   ECF 32-1 at 7, BANA Memo.   In response, plaintiff contends that "violations on the specialty instruments in the State of Maryland" are subject to a twelve-year statute of limitations.    ECF 40 ¶ 5, Opposition; *see* Maryland Code (2009 Repl. Vol., 2014 Supp.), § 5-102(a) of the Courts and

Judicial proceedings Article ("C.J.") (noting that an action on a specialty shall be filed within 12 years after the course of action accrues).

In general, under Maryland law, a contract under seal is legally enforceable for 12 years. *See*, *e.g.*, *Warfield v. Balt. Gas & Elect. Co.*, 307 Md. 142, 143-45, 512 A.2d 1044, 1044-47 (1986). Presumably, Willis seeks to argue that he had twelve years to assert a claim based on his mortgage. Nevertheless, I am unaware of any authority that would characterize plaintiff's claims as an action on a specialty, so as to provide a twelve-year period of limitations. And, plaintiff cites no authority for that proposition. To the extent that Count I is based on TILA, RESPA, or MCPA, I agree with defendant that the claim has been filed out of time.

Congress enacted TILA, 15 U.S.C. §§ 1601 *et seq.*, to "'assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.'" *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 364-65 (1973) (quoting 15 U.S.C. § 1601(a)). The statute "requires creditors to provide borrowers with clear and accurate disclosures of terms," *Beach v. Ocwen Federal Bank,* 523 U.S. 410, 412 (1998), and imposes civil liability on creditors who fail to do so. 15 U.S.C. § 1640(a); *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 54 (2004).

Pursuant to 15 U.S.C. § 1640(e), a TILA action must be brought within one year "from the date of the occurrence." Here, if the latest "kickback" payment was made in March of 2006, an action to challenge this payment pursuant to TILA had to be filed by March 2007, in order to satisfy § 1640(e). Suit in this case was not filed until 2013. *See* ECF 2.[19] Thus, the TILA claim

---

[19] As indicated, there is a discrepancy as to when in 2013 this suit was filed. According to the Notice of Removal, filed on September 9, 2013, suit was filed on April 18, 2013. ECF 1 ¶ 1, Notice of Removal. However, in BANA's Motion, ECF 32-1 at 1, and in the Reply, ECF 4 at 1, defendant alleges that suit was filed on August 1, 2013. The Complaint does not resolve the issue conclusively, as the document is not dated. But, according to the "Certificate of

is time-barred.

The second statutory predicate for Count I is RESPA.  Congress enacted RESPA in order "to insure that consumers . . . are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices . . . ." 12 U.S.C. § 2601.  Pursuant to 12 U.S.C. § 2605, RESPA claims are subject to a three-year statute of limitations.  Plaintiff would have known or could have known the prevailing interest rates and his own credit score.  As applied to this case, if the latest "kickback" payment was made in March 2006, an action to challenge the payment on the basis of a RESPA violation had to be filed by March 2009, in order to satisfy 12 U.S.C. § 2605.  Suit was not filed until 2013, several years out-of-time.  As such, the RESPA claim is time-barred.

The MCPA is also a statutory predicate for Count I.  The MCPA, which prohibits certain "unfair or deceptive trade practices," C.L. § 13–301, is subject to a three-year statute of limitations from "the date [the action] accrues . . . ."  Md. Code (2014 Repl. Vol.), § 5-101 of the Courts and Judicial Proceedings Article ("C.J."); *Fontell v. Hassett*, 870 F. Supp. 2d 395, 415 (D. Md. 2012) ("The statute of limitations under the [MCPA] is three years.").  As such, in the context of an MCPA, the Court must consider when the cause of action accrued, which is not necessarily the date of the wrong.

"Maryland has adopted the discovery rule, which tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury."  *Windesheim v. Larocca*, 443 Md. 312, 326-27, 116 A.3d 954, 962

---

Service" attached to the Complaint, "a copy of the Complaint . . . was mailed" on July 30, 2013. In any event, the precise date in 2013 is irrelevant to resolve plaintiff's TILA's claim.  No matter when suit was filed in 2013, the Complaint was filed out of time.

(2015) (internal quotations omitted); Maryland Code (2013 Repl. Vol., 2014 Supp.), § 5-203 of the Courts and Judicial Proceedings Article ("C.J."). As explained by the Maryland Court of Appeals, "[n]otice is critical to the discovery rule. Before an action can accrue under the discovery rule, a plaintiff must have notice of the nature and cause of his or her injury." *Windesheim*, 443 Md. at 327, 116 A.3d at 962 (internal quotations omitted).

Defendant fails to address the discovery rule and the issue of notice. It assumes, without explanation, that the three-year statute of limitations began to run when the monies were paid in 2006. The portion of my prior Memorandum Opinion discussing accrual of a cause of action is pertinent, ECF 23 at 18-19:

> An action typically accrues at the time of the wrong, unless a judicial or legislative exception provides otherwise. *Poole* [*v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011)]. But, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," Maryland has adopted the so-called discovery rule to determine the date of accrual. *See* [*Bank of New York v.*] *Sheff*, [382 Md. 235, 244, 854 A.2d 1269, 1275 (2004)]; *Frederick* [*Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000)]; *see also* C.J. § 5–203. "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).
>
> Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F.Supp.2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012). Nevertheless, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Id.* at 167–68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano*, 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Washington*, 114 Md. App. 169, 188–89, 689 A.2d 634, 644 (1997)). A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and . . . [that] a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort.'" *Dual Inc.* [*v. Lockheed Martin Corp.*, 383 Md. 151, 168, 857 A.2d 1095, 1104 (2004)] (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448–49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Notice

may be actual or constructive. *Poffenberger v. Risser*, 290 Md. 631, 636–38, 431 A.2d 677, 680–81 (1981); *see also United States v. Kubrick*, 444 U.S. 111 (1979) (concluding, under the Federal Tort Claims Act, that plaintiff's negligence claim accrued when plaintiff knew of both the existence of the harm and its cause).

Turning to the allegations here, the wrongful conduct challenged in Count I is the "kickback" or "yield premium" that plaintiff claims he paid to Bondcorp in 2006.  It is not apparent from the Supplemental Amended Complaint when the alleged wrong was discovered by plaintiff, although he seems to suggest that he made certain discoveries in 2011, when the foreclosure case was dismissed.  ECF 30 ¶ 27, SAC.  But, at least as of 2009, plaintiff was on inquiry notice that something was supposedly amiss with his mortgage and that he potentially made improper "kickback" payments to Bondcorp.

On May 6, 2009, plaintiff wrote a letter to Edward S. Cohn, one of the Substitute Trustees, in which he (Willis) expressly stated:  "I am disputing the entire debt of $348,453.81." ECF 2-2, Letter from Willis to Cohn dated May 6, 2009 ("Letter of May 6, 2009"); *see* ECF 2-5, Order to Docket (listing Cohn as one of the Substitute Trustees).  In the Letter of May 6, 2009, Willis also asked Cohn to "please advise who is the owner of the note.  You stated in your letter that you were the holder of the note, but who is the actual owner of the note and/or lender."  ECF 2-2 at 1.  At this point, it is plain that plaintiff "possesse[d] facts sufficient to cause a reasonable person to investigate further . . . ." *Dual Inc., supra*, 383 Md. at 168, 857 A.2d 1095 (internal quotations omitted).   Indeed, Willis's Letter of May 6, 2009, substantiates that Willis had already begun to investigate the status of his obligations on the Note

In addition, Michael J. McKeefery, Esquire, an attorney at Cohn's firm, wrote a letter to Willis on February 5, 2010, acknowledging receipt of Willis's Letter of May 6, 2009.  ECF 2-3 at 1 ("Letter of February 5, 2010").  McKeefery stated:  "In response to your dispute of the debt owed, I am enclosing herewith . . . a payment history for the loan through April 28, 2009."  *Id.*

As noted, the standard "for accrual does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Brown*, *supra*, 731 F.Supp.2d at 449.   This response from McKeefery supports the fact that Willis was on inquiry notice at least by February 5, 2010, if not earlier, with respect to his concerns of illegality or impropriety as to the lender's conduct.

This suit was filed after February of 2013.   Thus, the claim in Count I based on the MCPA is time-barred.

In addition, BANA contends that the two $2,857.99 payments at issue are not a "yield spread premium" at all.   Rather, defendant insists the two payments of $2,857.99 were Willis's first two monthly payments due on the loan.   ECF 32-1 at 4, BANA Memo.   Indeed, according to an exhibit submitted by plaintiff and attached to the original Complaint, entitled "Total Monthly Payments" (ECF 2-1), the monthly payment due on the loan was in fact equal to $2,857.99.   ECF 2-1 at 1.   According to the Total Monthly Payments exhibit, this $2,857.99 amount is comprised of principal and interest of $2,387.62; a "reserve for property taxes" of $377.95; and "hazard insurance reserve" of $92.42.   *Id.* at 1.   Thus, BANA is puzzled as to why plaintiff "inexplicably" characterizes the first two monthly payments under the loan for February and March 2006 as a "yield premium."   ECF 32-1 at 4, BANA Memo.

Given my disposition as to Count I on other grounds, I need not address the merits of this contention.

**B.  Count VIII, titled "(Breach of Contract) Robo Signing"; Count XVII titled "(Breach of Contract") Constructive Fraud – Forged Loan Documents"**

Both Count VIII and Count XVII allege breach of contract.   Both counts relate to the purportedly fraudulent Note and Deed of Trust of January 2, 2006; Willis claims that those documents were forged.   *See*, *e.g.*, ECF 30 ¶ 35, SAC.   Plaintiff insists that the Note and Deed of

Trust were actually executed about two weeks earlier, on December 16, 2005. *Id.* ¶ 24; *see also* ECF 2-19, Note dated December 16, 2005; ECF 2-18, Deed of Trust dated December 16, 2005.

With respect to Count VIII, Willis maintains that "Defendant's robo-signing of these documents were fraudulent and/or intentional misrepresentations. ECF 30 ¶ 29. Willis asserts that "defendant breached their contractual obligations for the Note and Deed of Trust by not disclosing to the Plaintiff that the Defendant fraudulently and/or intentionally misrepresented the fact that the Defendant's [sic] illegally affixed the Plaintiff's signature to the Note and Deed of Trust dated January 2, 2006." *Id.* ¶ 32, SAC.

As to Count XVII, Willis alleges: "Defendant forged the Plaintiffs [sic] signatures on the Note and Deed of Trust dated January 2, 2006 and recorded the instruments for public record." ECF 30 ¶ 35, SAC. Further, plaintiff asserts: "Defendant had a legal and equitable duty not to forge and record false documents." *Id.* ¶ 36. Willis adds: "Due to Defendans [sic] position as a lender, Plaintiff had trust and confidence that the Defendant would have all documents to a loan transaction properly executed." *Id.* ¶ 37.

Willis seeks $600,000 in compensatory damages for Count VIII and a declaration that the Note and Deed of Trust are "null and void," among other requests. *Id.* ¶ 6. He seeks similar relief as to Count XVII. *Id.* ¶ 40.

BANA argues that plaintiff cannot state a claim for breach of contract because plaintiff "fails to allege even the contractual provisions that [the Bank] purportedly breached, how specifically the provisions were breached, when the provisions were breached and how he was conceivably damaged by such breach." ECF 32-1 at 9, BANA Memo. Plaintiff counters that by pleading "forgery in Counts VIII and XVII," he has "met the requirements of alleging breach of contract in accordance with C.L. § 3-308(a). ECF 40 ¶ 9, Opposition.

To state a breach of contract claim, a plaintiff must show that the parties reached a valid and binding agreement; that the defendant breached the terms of the agreement; and that the plaintiff suffered damages as a result of the breach. *See Taylor v. NationsBank, N.A.,* 365 Md. 166, 175, 776 A.2d 645, 651 (2001). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318–19, 888 A.2d 277, 396 (2008). To survive a motion to dismiss a breach of contract claim, a complaint must "allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by the defendant." *Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001) (citations omitted).

Plaintiff's reference to C.L. § 3-308(a) is misplaced. Section § 3-308(a) does not relate in any way to a common law claim for breach of contract. Rather, it pertains to actions to enforce a negotiable instrument. In particular, C.L. § 3-308(a) states, in pertinent part:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature. If an action to enforce the instrument is brought against a person as the undisclosed principal of a person who signed the instrument as a party to the instrument, the plaintiff has the burden of establishing that the defendant is liable on the instrument as a represented person under § 3-402(a).

Although the statute referenced by plaintiff governs the enforcement of negotiable instruments, such as promissory notes, it has no bearing on whether plaintiff has stated a claim against BANA for breach of contract. As indicated, the Maryland Court of Appeals has explained that to state a breach of contract claim, a plaintiff must demonstrate the breach of a

"valid and binding agreement . . . ." *Taylor*, 365 Md. at 175.  And, in this respect, the Complaint falls short.  To the extent the contracts at issue are the Loan Documents, plaintiff has failed to identify any terms in the Note, Deed of Trust, or any other agreement that defendant purportedly breached.  *See Parillon v. Fremont Inv. & Loan,* No. L–09–3352, 2010 WL 1328425, at *4 (D. Md. Mar. 25, 2010) (dismissing plaintiff's breach of contract claim where plaintiff did "not identify a term set forth in the Loan, the Deed of Trust, or any other contract, that a named defendant breached").  In sum, plaintiff's conclusory allegations with respect to a breach of contract are insufficient to state a claim. Therefore, Count VIII and Count XVII shall be dismissed, with prejudice.

To the extent, plaintiff intends to allege fraud through Count VIII or Count XVII, any such claim must also fail as previously dismissed, with prejudice.  In particular, in my prior Memorandum Opinion, plaintiff's claim for common law fraud in connection with purportedly robo-signed documents was dismissed, with prejudice.  ECF 23 at 30-36, Memorandum Opinion (dismissing Count XI of the Complaint, with prejudice); *see also* ECF 2 at 15, Complaint (lodging a claim titled "Count XI (Common Law Fraud) Robo – Signing"). Likewise, plaintiff's claim for common law fraud in connection with forged or fabricated Loan Documents was also dismissed, with prejudice.  ECF 23 at 21-24, Memorandum Opinion (dismissing Count XIII of the Complaint, with prejudice); *see also* ECF 2 at 17, Complaint; *id* ¶ 119 (lodging a claim titled "Count XIII (Common Law Fraud) Forged Loan Documents," accusing defendants of, *inter alia*, "fabricat[ing] the loans [sic] documents with the date of January 2, 2006").

### C.  **Count XX, titled "(Deceptive Trade Practices) Predatory Servicing"**

Count XX relates to defendant's alleged duty to offer plaintiff a loan modification

pursuant to HAMP,[20] as set forth in 12 U.S.C. § 5201, *et seq.*  ECF 30 ¶¶ 43-47, SAC.  Plaintiff complains that because he met "all the HAMP requirements," *id.* ¶ 47, defendant was "obligated by law to offer the HAMP program" as an option to plaintiff.  *Id.* ¶ 50.  But, according to plaintiff, BANA "never mentioned the HAMP program" to plaintiff.  *Id.* ¶ 48.  He maintains that BANA's decision to offer a plan other than HAMP was "driven solely by greed instead of abiding by the mandatory requirements the Defendant pledged to follow in exchange for receiving the funds from the Economic Stabilization Act bailout."  ECF 30 ¶ 49, SAC.  *Id.*

Defendant argues in the first instance that Count XX must fail because HAMP does not provide for a private cause of action.  ECF 32-1 at 9, BANA Memo.  In response, plaintiff insists:  "There is ample support that aggrieved mortgagors may assert an allegation of regulatory non-compliance as a shield against unauthorized foreclosure actions. The statutory law is clear on the mortgagee's duty to pursue loss mitigation efforts."  EF 40 at 3, Opposition.

*Spaulding*, *supra*, 714 F.3d 769, is pertinent.  In *Spaulding*, the Fourth Circuit discussed HAMP and quoted at length from a Seventh Circuit decision describing the Emergency Economic Stabilization Act and the role of HAMP.  It said, *id.* at 773 (quoting *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 556–57 (7th Cir. 2012)) (alterations in *Spaulding*):

> The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to "implement a plan that seeks to maximize assistance for homeowners and ... encourage the servicers of the underlying mortgages ... to take advantage of ... available programs to minimize foreclosures." 12 U.S.C. § 5219(a). Congress also granted the Secretary the authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.*
>
> Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure.

---

[20] As indicated, HAMP stands for Home Affordable Modification Program.

The Secretary negotiated Servicer Participation Agreements (SPAs) with dozens of home loan servicers, including Wells Fargo. Under the terms of the SPAs, servicers agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program. In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives. The SPAs stated that servicers "shall perform the loan modification ... described in ... the Program guidelines and procedures issued by the Treasury ... and ... any supplemental documentation, instructions, bulletins, letters, directives, or other communications ... issued by the Treasury." In such supplemental guidelines, Treasury directed servicers to determine each borrower's eligibility for a modification ...:

[T]he borrower had to meet certain threshold requirements, including that the loan originated on or before January 1, 2009; it was secured by the borrower's primary residence; the mortgage payments were more than 31 percent of the borrower's monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750...

Where a borrower qualified for a HAMP loan modification, the modification process itself consisted of two stages. After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using the waterfall method. The trial period under the TPP lasted three or more months, during which time the lender "must service the mortgage loan ... in the same manner as it would service a loan in forbearance." Supplemental Directive 09–01. After the trial period, if the borrower complied with all terms of the TPP Agreement— including making all required payments and providing all required documentation—and if the borrower's representations remained true and correct, the servicer had to offer a permanent modification. *See* Supplemental Directive 09–01 ("If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period . . . .").

Under the HAMP framework, if a borrower enters a modification agreement, the agreement "may create legally enforceable contractual rights." *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 449 (D. Md.), *aff'd*, 546 F. App'x 165 (4th Cir. 2013); *see also Legore v. OneWest Bank, FSB,* 898 F.Supp.2d 912, 917–18, 2012 WL 4903087, at *4 (D. Md. 2012); *Allen v. CitiMortgage, Inc.,* 2011 WL 3425665, at *4–6 (D. Md. Aug. 4, 2011). But, defendant correctly contends that HAMP does not create a private right of action. *Farasat v. Wells Fargo*

*Bank, N.A.*, 913 F. Supp. 2d 197, 203 (D. Md. 2012); *Allen v. CitiMortgage,* Civil No. CCB–10–2740, 2011 WL 3425665, at *4 (D. Md. Aug. 4, 2011).

As Judge Blake explained in *Goss*, 917 F. Supp. 2d at 449, "[w]here a homeowner has not entered into any agreement under HAMP [ ], private plaintiffs have no cause of action to enforce HAMP guidelines on behalf of the federal government or as a third-party beneficiary of the HAMP participation agreement between the federal government and the mortgage servicer." *See also Bowers v. Bank of America, N.A.,* 905 F. Supp. 2d 697 (D. Md. 2012); *Parks v. BAC Home Loan Servicing, LP,* 825 F. Supp. 2d 713, 715–16 (E.D. Va. 2011); *Sheard v. Bank of Am., N.A.*, No. CIV. PJM 11-3082, 2012 WL 3025119, at *3 (D. Md. July 23, 2012); *see also Wigod*, *supra*, 673 F.3d at 559 n.4 (citing *Astra USA, Inc. v. Santa Clara County, Cal.*, ____ U.S. ____, 131 S. Ct. 1342 (2011)). Although plaintiff appears frustrated with defendant's failure to disclose the availability of a modification under HAMP, without a HAMP modification agreement, the Supplemental Amended Complaint fails to state any actionable claims in violation of HAMP.

In the alternative, plaintiff appears to allege that BANA's failure to disclose the availability of a HAMP modification violated MCPA, C.L. § 13-101.  ECF 30 ¶ 48, SAC ("Due to the Defendant being obligated by the law to offer the HAMP program to the Plaintiff who qualified for the program, the Defendant also violated [C.L. §] 13-101 [of the MCPA] by attempting and threatening to exercise a right that did not exits [sic] by offering a plan based on greed instead of the mandatory required HAMP plan.").  C.L. § 13-101 does not prohibit any particular type of activity.  Rather, it states that "[u]nfair or deceptive trade practice" has the meaning stated in Subtitle 3 of [Title 13]."  C.L. § 13-101(k).

Presumably, by referencing C.L. § 13-101, plaintiff attempts to characterize defendant's purported omissions in connection with HAMP as unfair or deceptive trade practices under the

MCPA.  Turning to Subtitle 3 of Title 13, "unfair or deceptive trade practices" are defined as, *inter alia*, "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers[.]"  C.L. § 13-301(1). To bring an action under the MCPA, a plaintiff must allege "(1) an unfair or deceptive practice or misrepresentation that (2) is relied upon, and (3) causes [him] actual injury."  *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012), *aff'd sub nom. Lembach v. Bierman*, 528 F. App'x 297 (4th Cir. 2013) (citing *Lloyd v. Gen Motors Corp.*, 397 Md. 108, 140, 916 A.2d 257, 277 (2007)).  Of particular relevance here, the MCPA requires an "actual injury."  *Id.*  In *Citaramanis v. Hallowell,* 328 Md. 142, 151, 613 A.2d 964, 968 (1992), the Maryland Court of Appeals emphasized that, because the CPA's private right of action is limited to recovery of "injury or loss sustained," a plaintiff "pursuing a private action under the CPA [must] prove actual 'injury or loss sustained'" in order to prevail. *Citaramanis*, 328 Md. at 151, 613 A.2d at 968; *accord McDaniel v. Baranowski*, 419 Md. 560, 587–88, 19 A.3d 927, 943 (2011).

As noted, plaintiff complains that defendant failed to offer plaintiff a HAMP modification even though plaintiff qualified for such a modification.  As plaintiff sees it, BANA misled plaintiff and failed to disclose the material fact that there was another viable loan modification option through the HAMP program.  Instead, BANA "counselors" offered plaintiff "only one modification program . . . which [provided for] back payments and the principal to be rolled into one loan regardless [of whether] the value of the home [was] significantly lower." ECF 2-20, Letter from Willis to BANA dated March 30, 2013.  Plaintiff does not explicitly describe how a HAMP modification would have been more favorable than the modification offered by BANA.  But, in the Letter of March 30, 2013, Willis said:  "I was denied a request to

speak with a direct supervisor or negotiator to discuss other home retention programs which included reducing [the] principal [sic] or just simply negating the back payments." *Id.*

Defendant insists that "[p]laintiff's allegations do not support a claim under the MCPA." ECF 32-1 at 10, BANA Memo.  In particular, BANA asserts: "A claim under the MCPA is essentially a fraud allegation subject to heightened pleading standards."  ECF 32-1 at 11, BANA Memo (citing to *Allen v. CitiMortgage*, No. 10-2740-CCB, 2011 WL 3425665, * 9 (D. Md. 2011)); *Johnson v. Wheeler*, 492 F.Supp.2d 492, 509 (D. Md. 2007)).  It posits that Count XX did not satisfy Fed. R. Civ. P. 9(b).

In *Allen*, plaintiffs alleged "that [defendant] violated the MCPA, in part, by making deceptive representations, failing to disclose relevant information about HAMP as a modification option, and making false or misleading representations to borrowers" in connection with a trial loan modification plan. *Allen*, 2011 WL 3425665, at *9.   As explained by Judge Blake in *Allen*, under the HAMP framework, "[i]f a mortgage servicer determines that the borrower is eligible for HAMP, the servicer may offer the borrower a three-month Trial Period Plan ("TPP"), during which the borrower pays reduced mortgage payments. If all of the conditions of the TPP Agreement are satisfied, the borrower may then proceed to step two of the process, at which point he or she is offered a permanent loan modification." *Id.* at *1.  Judge Blake found that the MCPA claim "sound[ed] in fraud," and thus, the claim was subject to the "heightened pleading standard" of Fed. R. Civ. P. 9(b). *Id.* at *9. Ultimately, she concluded that Rule 9 was satisfied because "plaintiffs have pled the dates and contents of numerous contradictory letters sent by CitiMortgage that they allege were both misleading and false." *Id.*

*Johnson v. Wheeler*, *supra*, 492 F. Supp. 2d 492, produced a similar outcome.   In *Johnson*, plaintiffs sought defendants' assistance in an attempt to refinance the loan on their

home and prevent its sale at foreclosure.  *Id.* at 496.  The plaintiffs alleged that the defendants contravened the MCPA "by making false and misleading statements to the [plaintiffs]" during the refinancing process.  *Id.* 509.  In their motions to dismiss, defendants argued that "because fraud is at the heart of Defendants' alleged violations of the [MCPA]," the particularity requirements of Rule 9(b) were applicable.  *Id.*  In their view, plaintiffs were "obliged to identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments, specifying which [d]efendant or [d]efendants is or are supposedly responsible for those statements or omissions."  *Id.*  The *Johnson* Court found this line of reasoning "persuasive" and dismissed the MCPA claim.  *Id.*

The reasoning articulated in *Johnson* and *Allen* is apt here, as plaintiff's allegations similarly hinge upon defendant's purported fraudulent representations or omissions in connection with the HAMP program.  Thus, Count XX is subject to the heightened pleading standard of Rule 9(b).  Under Rule 9(b), at first blush, that Willis must state his claim of fraudulent misrepresentation with particularity, specifying the "date, place and time of active misrepresentations or the circumstances of active concealments . . . ."  *Johnson*, 492 F. Supp. 2d at 509.  And, the Supplemental Amended Complaint does not include these sorts of particulars.

Nonetheless, as indicated, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation." *Shaw*, *supra*, 973 F.Supp. at 552 (internal quotations omitted).  Accordingly, although Willis has failed to identify the individuals working for BANA who were responsible for the alleged fraud, I shall not rely on such deficiencies.  Instead, I shall grant the Motion to Dismiss as to Count XX

because plaintiff fails to allege any reliance or injury as a result of defendant's alleged misrepresentations or omissions.

Of particular relevance here, the MCPA requires an "actual injury."  *Stewart*, *supra*, 859 F. Supp. 2d at 768.    In *Citaramanis v. Hallowell*, *supra,* 328 Md. at 151, 613 A.2d at 968, the Maryland Court of Appeals emphasized that, because the CPA's private right of action is limited to recovery of "injury or loss sustained," a plaintiff "pursuing a private action under the CPA [must] prove actual 'injury or loss sustained'" in order to prevail.  *Id.* at 151, 613 A.2d at 968; *accord Baranowski*, *supra*, 419 Md. at 587–88, 19 A.3d at 943.

The Maryland Court of Appeals's decision in *Lloyd v. Gen. Motors Corp.*, *supra*, 397 Md. at 143, 916 A.2d at 277, is instructive.  There, the court stated, *id.* at 143, 916 A.2d at 277:

> This Court has held . . . that a private party suing under the Consumer Protection Act must establish "actual injury or loss." *Citaramanis v. Hallowell*, 328 Md. 142, 153-54, 613 A.2d 964, 969 (1992); *Morris v. Osmose,* 340 Md. 519, 538 n. 10, 667 A.2d 624, 635 n. 10 (1995); *McGraw v. Loyola Ford, Inc.,* 124 Md. App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999). *See* Maryland Code, (1975, 2005 Replacement Vol.) § 13-408 of the Commercial Law Article ("any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title").

The court added, *id.*:

> We have, in earlier cases, established that, in order to articulate a cognizable injury under the Consumer Protection Act, the injury must be objectively identifiable. In other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation. *Golt v. Phillips,* 308 Md. 1, 11-14, 517 A.2d 328, 333-335 (1986); *Citaramanis,* 328 Md. at 151-53, 613 A.2d at 968-70 (1992); *Morris v. Osmose,* 340 Md. at 538 n. 10, 667 A.2d at 635 n. 10 (1995); *McGraw v. Loyola Ford,* 124 Md. App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

Here, on the issue of damages, plaintiff rests on the naked assertion that, due to defendant's "misleading practices . . . [p]laintiff has suffered damages."  This is not sufficient to state a claim under the MCPA.  What I stated in my Memorandum Opinion of August 1, 2014,

remains pertinent, ECF 23 at 42:

> [P]laintiff's vague assertions that he "suffered damages" are insufficient to allege that he sustained an actual injury or loss due to defendants' alleged violations of the MCPA. *Compare Willis v. Countrywide Home Loans Servicing*, No. CCB–09–1455, 2009 WL 5206475, at *6 (D. Md. Dec. 23, 2009) (dismissing MCPA claim because plaintiff failed to allege "that Countrywide's misinformation regarding loan modification programs caused [plaintiff] to suffer any specific harm, apart from the debt that he already owed") and *Murray v. Bierman, Geesing, Ward & Wood, LLC,* RWT 11 CV 1623, 2012 WL 4480679 (D. Md. Sept. 27, 2012) (dismissing plaintiff's MCPA claim because plaintiff could not "establish the nature of the actual injury or loss that he sustained, apart from the mortgage loan debt that he already owed," and plaintiff "alleged no other harm that he sustained as a result of Defendants' conduct) *with Currie* [*v. Wells Fargo Bank, N.A.,* 950 F.Supp.2d 788, 797 (D. Md. 2013)] (finding that defendant's alleged practice of "churning" loan modification applications, whereby defendant stated it would consider plaintiffs for a loan modification even though it did not, "plausibly resulted in the misallocation of mortgage payments and/or charges beyond those for which Plaintiffs otherwise would have been liable").

As such, Count XX is dismissed, with prejudice.

## IV. Conclusion

A separate Order follows, consistent with this Memorandum Opinion.


Date: September 2, 2015                                   /s/ _____
                                                          Ellen Lipton Hollander
                                                          United States District Judge

37